MEADE (ROTCHFORD v.). See Case No. 12,083.

MEADE, The GEN. GEO. G. See Case No. 5,312.

MEADER (NORTON v.). See Case No. 10,351.

## Case No. 9,375.

### In re MEADOR.

[1 Abb. U. S. 317; 2 Am. Law T. Rep. U. S. Cts. 140, 153; 10 Int. Rev. Rec. 74; 5 Am. Law Rev. 166; 3 West. Jur. 209; 2 Leg. Gaz. 193.][2]

District Court, N. D. Georgia. Aug. 24, 1869.

INTERNAL REVENUE LAWS—COMPELLING PERSONS TO TESTIFY—POWERS OF SUPERVISOR.

1. It is not necessary, in order to support an application by a supervisor of internal revenue, for an attachment to compel a person liable to taxation to appear and testify and produce his books, &c. that the supervisor should appear to have acted, in issuing the summons, under any

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission. 5 Am. Law Rev. 166, and 2 Am. Law T. Rep. U. S. Cts. 153, contain only partial reports.]

special instructions from the commissioner of internal revenue. The supervisor must obey any special instructions which are shown to have been given. But in the absence of proof of instructions, it will be presumed that his acts have been in pursuance of his official duty.

. [Cited in Re Platt. Case No. 11,212; U. S. v. Three Tons of Coal, Id. 16,515.]

2. The extent of the powers of a supervisor of internal revenue to order persons chargeable with a tax to appear before him for examination, and to produce books and papers; and the powers of a district court to punish disobedience to such order as a contempt,—explained.

Application for an attachment for contempt.

J. Milledge, Dist. Atty., and L. E. Bleckley, for the motion, cited 1 W. Bl. 555; 4 Bancr. Hist. U. S. 414; Act July 13, 1866, § 9 (14 Stat. 102); Act July 13, 1866, § 14 (14 Stat. 151); Conk. Tr. 740; Act July 20, 1868 (15 Stat. 125); Act 1831 (4 Stat. 457); 3 Am. Law Rev. 641.

O. A. Lochrane and L. J. Gartrell, in opposition, cited In re Judson [Case No. 7,563]; 5 Taunt. 260; Act March 2, 1831; Brightly, Fed. Dig. 94, 166, 168, 189; 1 Nev. & M. 725; [Geyger v. Geyger] 2 Dall. [2 U. S.] 333; Henry v. Ricketts [Case No. 6,386]; De Lome, 89, note; Writs of Assistance; Int. Rev. Acts 1866–67, p. 286; L. R. 417; Law U. S. Cts. 47; Code Ga. 995; Hurd, Hab. Corp. 325–328; 11 Exch. 290; Brown v. Galloway [Case No. 2,006].

ERSKINE, District Judge. The supervisor of internal revenue for the states of Florida and Georgia issued a summons against each of the members of the firm of Meador & Brothers, dealers in tobacco, in Atlanta, Georgia, under a provision contained in section 49 of the act of congress of July 20, 1868, requiring them to appear before him, at his office, at a certain time, and to testify under oath, and to produce their books, papers, &c. relating to any business transacted by or through them, from July 20, 1868, to July 1, 1869. The foregoing is only a synopsis of the contents of the summons. The parties were duly served, but failed to appear or to produce their books before the supervisor. He then made application to me, in pursuance of a provision contained in section 9 of the act of July 13, 1866 (14 Stat. 102), for an attachment against the Meadors. But, before it was issued they voluntarily appeared; an attachment nisi was granted and time given to them to show cause why it should not be made absolute. On the return day, they appeared, and by their counsel, Gartrell and Lochrane, placed their defense on file. It is in substance as follows:

First. That so much of the act of July, 1868, as grants authority to a supervisor to compel persons to testify and to produce their books, &c. in an imaginary case, is unconstitutional and void.

Second. If constitutional, still the supervisor can only proceed to compel the production of books, &c. in the same manner and

to the same extent as assessors can do; and that neither "can compel persons to testify and produce their books, &c. in an imaginary case against parties residing out of their districts."

Third. That section 49 of the act authorizing the supervisor to summon any person to produce books, &c. and to appear and testify under oath, is of no effect, "because the provisions of the act of July, 1866, for enforcing the summons are inconsistent with the provisions of existing laws for the punishment of contempts."

Fourth. That no order of punishment can be rendered in a case before the judge, for disobeying a summons to appear before a supervisor, as the act "directs that no order can be issued inconsistent with existing laws for the punishment of contempts, and by those laws no court or tribunal can punish for contempt, except as against violations of its own orders."

Fifth. That the powers here claimed by the supervisor "are judicial powers, and that the judiciary is expressly fixed by the constitution and previously existing laws—neither assessors nor supervisors forming any part of it."

During the argument, which was elaborate and able, additional propositions were advanced orally, and various objections were taken to the constitutionality of section 9 of the act of 1866, and section 49 of the act of 1868.

Section 49 of the act of 1868 (15 Stat. 144), after providing for the appointment by the secretary of the treasury, on the recommendation of the commissioner of internal revenue, of certain officers, 'to be called supervisors of internal revenue, proceeds to define their duties and powers as follows: "It shall be the duty of every supervisor of internal revenue, under the direction of the commissioner, to see that all laws and regulations relating to the collection of internal taxes are faithfully executed and complied with; to aid in the prevention, detection, and punishment of any frauds in relation thereto, and to examine into the efficiency and conduct of all officers of internal revenue within his district; and for such purposes, he shall have power to examine all persons, books, papers, accounts, and premises, and to administer oaths and to summon any person to produce books and papers, or to appear and testify under oath before him, and to compel a compliance with such summons in the same manner as assessors may do," &c.

The mode by which assessors may compel a compliance is pointed out in section 9 of the act of 1866: "In case any person so summoned shall neglect or refuse to obey such summons, or to give testimony, or to answer interrogatories as required, it shall be lawful for the assessor to apply to the judge of the district court or to a commissioner of the circuit court of the United States for the district within which the person so summoned resides for an attachment against such person as for a contempt. It shall be the duty of such judge or commissioner to hear such application, and, if satisfactory proof be made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing, the judge or commissioner shall have power to make such order as he shall deem proper, not inconsistent with the provisions of existing laws for the punishment of contempts, to enforce obedience to the requirements of the summons and punish such person for his default or disobedience."

At the opening of the proceedings, Mr. Milledge, United States attorney, stated that he held a letter of instructions from the commissioner of internal revenue to the supervisor, dated June 11, 1869, and added that it was desirable it should be read to satisfy the Meadors that it was not idle curiosity, but duty, that guided him in issuing the summons. It was produced and read.

The substance of the letter was, that certain officers of the internal revenue department had been in Georgia, examining with reference to the affairs of certain dealers in tobacco, snuff, &c., whose factories in Virginia and North Carolina had been seized, and that the assessor at Atlanta was instructed to procure information from agents of the tobacco houses in question, which it was necessary to use in connection with the cases in which the officers referred to were engaged. He is then instructed to obtain from the books, &c. of these agents,—whose names would be furnished to him by the said assessor,—the information needed by the said officers, and forward it to them, at Richmond, Virginia.

It was argued for the Meadors that the provision in the act giving power to the supervisor to compel persons to testify under oath before him, and to produce their books, papers, &c. for his inspection, in an imaginary case, is unconstitutional and void.

Admit the assumption—directly or hypothetically—does it therefore follow that the law is unconstitutional? If this is an "imaginary case"—a mere visionary fancy emanating from the brain of the supervisor—it ought not to be countenanced; for a proceeding of this kind might prove little less hurtful to the mercantile interests of the Meadors than one begun and prosecuted to gratify sinister inquisitiveness or mischievous espionage, and not bona fide, and for the public good. Moreover, to institute a proceeding or action, not to determine a right or controversy, but to deceive the court and raise a prejudice against third persons, is a contempt. Coxe v. Phillips, Cas. T. Hardw. 237, 3 Hawk. P. C. 220.

But after a careful perusal of the statute and the letter of the commissioner (which letter is in evidence), my mind is satisfied that this proceeding is not in an imaginary case;

but that, on the contrary, there was sufficient cause for the issuing of the summons by the supervisor, and that his action in the premises was warranted by the statute. If so, then this proceeding is legitimately here. Under direction of the commissioner, it is the duty of the supervisor to aid in the prevention, detection and punishment of any frauds in reference to the collection of internal revenue. The commissioner informs him that certain tobacco factories had been seized in Virginia and North Carolina; and directs him to procure the names of the agents of those factories, and to ascertain from their books, papers, &c. information needed by certain internal revenue employees or officers, touching the factories seized. Upon these instructions he seems to have acted.

But it must not be imagined from what has been just said that either written or verbal instructions are necessary before the supervisor can issue a summons under section 49 of the act of 1868. Congress did not so intend to limit his authority and usefulness. True, he must obey and follow the instructions of the commissioner when given. He must also act in good faith. And a public officer is presumed to act in obedience to his duty, until the contrary appears.

The ruling on this point being adverse to the Meadors, the proceedings, with the exception of, perhaps, some brief details, might end here; so far, at least, as the constitutionality of the provision in section 49 of the act of 1868, has been impugned. For, if this provision is void, when there is no real case, the presumption is fair that it is constitutional and valid, when the case is not an imaginary one.

Another point was presented and discussed, namely: That, granting the constitutionality of the provision, still, the supervisor can only proceed to compel parties to appear, testify or produce their books, &c. in the same manner, and to the same extent as assessors can do; and that neither can compel them to do any of these acts, in an imaginary case against persons residing out of his (the supervisor's) district.

Section 49 declares that it shall be the duty of the supervisor to aid in the prevention, detection and punishment of any frauds in relation to the collection of internal taxes, and to examine into the efficiency and conduct of all officers of internal revenue within his district.

For what purpose were the powers in question conferred upon the supervisor? The act says to aid in the prevention, detection, and punishment of any frauds in relation to the collection of taxes. There are no words in this clause—nor can any be imported into it —restricting the operation and effect of the supervisor's action to the territorial boundary of his district. True, his action is within his denominated district; but the legal consequences of the action may affect persons or things elsewhere. The next clause confers on the supervisor powers distinct and different from these, namely, to examine into the efficiency and conduct of the revenue officers within his district. And on this point I concur with the counsel for the Meadors. I likewise agree with them, that the supervisor can compel the production of books, &c. only in the manner and to the extent that an assessor can, under section 9 of the act of 1866. When either issues a summons, and the party served neglects or refuses to appear, to testify under oath, or to produce his books, &c. the power of each—the one as assessor, and the other as supervisor—is exhausted. For remedy, to compel compliance with the exigencies of the summons, he must make application in the manner provided in the section last referred to, to a judge or a commissioner.

Even on the hypothesis that this is an imaginary case, it is yet due to counsel on both sides, that the clauses cited from section 49 of the act of 1868, should receive a construction to the extent of their argument. Counsel for the Meadors insisted that section 49, empowering the supervisor to summon persons to appear, produce books. &c. and to testify under oath. is of no effect, because the provision in section 9 of the act of 1866 is inconsistent with the provisions of existing laws for the punishment of contempts.

It may be borne in mind that the section just referred to gives the same power to the judge to punish for contempts when acting under the authority of these revenue statutes as is possessed by the national courts themselves.

Congress, deriving authority from the constitution to ordain and establish courts of justice subordinate to the supreme court, has hitherto conferred upon these courts such jurisdiction as it has thought proper to bestow; but there still lie dormant in the national legislature vast and various powers which only await the exigency essential to call them into action.

Notwithstanding the jurisdiction of the national courts—supreme and inferior—is limited; they yet possess powers not granted by positive law; not independent, but auxiliary. For instance, although they have been vested by statute with power to inflict punishment for contempts (act of 1789 [1 Stat. 93], modified, after the impeachment of Judge Peck, by the act of 1831), still it does not follow, either from the peculiar constitution of these courts—their limited and defined powers—or the statutes declaratory of these powers, that they could not exercise the same authority without the aid of acts of congress; for the right to inflict summary punishment for a contempt is an inherent one, and indispensable to all courts of justice.

Chief Justice Marshall, in the case of U. S. v. Hudson. 7 Cranch [11 U. S.] 32. said: "Certain implied powers must necessarily result to our courts of justice from the nature of their institution. . . . To fine for con-

tempt—imprison for contumacy—enforce the observance of order, &c. are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others; and so far, our courts no doubt possess powers not immediately derived from statute."

Section 1 of the act of March 2, 1831, empowers the several courts of the United States to issue attachments and inflict summary punishment for contempts of court, but this power shall not extend to any cases except, &c., ". . . and the disobedience or resistance by any officer of said courts, party, juror, or witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts." See also the act of 1789.

Unlike those courts which have their origin in the common or unwritten law, the courts of the United States were created by written law. In the former, the jurisdiction is general, and all the proceedings brought before them are presumed to be within their cognizance until the contrary appears. In the latter, the jurisdiction is limited and defined, and they can take cognizance of such proceedings only as are affirmatively shown to be within their jurisdiction. Yet they possessed certain unexpressed powers incidental and appurtenant to all courts of adjudicature.

Comparing the provision of section 9 of the act of July, 1866, with the act just quoted and the act of 1789 referred to, I have failed to perceive wherein section 9 is inconsistent with either of those statutes. The powers granted by those acts are, I apprehend, sufficiently ample to enable the judge to carry into effect the provisions of section 9 of the act of 1866.

It was insisted that no court or tribunal could punish for contempt, except for violations of its own orders. This, as a general proposition, is correct. But, in proceedings under section 9 of the act of 1866, the question of contempt would arise for consideration only when some process or other lawful command of the judge was disobeyed.

It was contended, also, that the authority claimed by the supervisor to issue summons, requiring persons to appear before him, is a judicial act. That issuing a summons and requiring persons to appear, testify under oath, produce books, &c. may be, if taken in an extended sense, a judicial act, must, I think, be admitted. But the mere issuing of a summons is in itself only a ministerial act. Nor did congress in using the term "summons," in section 49 of the act of 1868, contemplate it to be of the legal dignity of a writ, or other judicial process; but simply a notice—and similar in its nature to a summons issued by an overseer of roads requiring persons to attend, with the necessary implements, and to work on the public highway. His summons, as has already been said, neglected or disobeyed, his authority ends. He must then apply to the proper

officer, as directed by section 9 of the act of 1866, to enforce obedience. And when the alleged delinquent is brought before the judge, he will "proceed to a hearing of the case"; and then, and not till then, can it be properly said that there is any exercise of judicial authority.

There exists in every political sovereign community the inherent power of guarding its own existence and protecting and exalting the happiness and welfare of its people at large. This sovereign power is known as the eminent domain of the nation or state, and embraces the power to appropriate the acquisitions of its subjects or citizens to public purposes, and to control and preserve the relations of social life—internal polity or police, public health and public morals.

Generic with the power of eminent domain is the power of taxation; each is essentially a sovereign attribute, lodged in the aggregate of the people. When the right of eminent domain is exercised, it appropriates property exceeding the owner's share of contribution to the public burden. Taxation is the proportional and reasonable assessment which may be imposed from time to time upon persons or property. The national constitution prohibits the taking of private property for public use without just compensation. The tax-payer receives a full and just compensation for his share of contribution to the public necessity by the benefit conferred on him, in the proper appropriation of the tax paid.

Notwithstanding these two powers have, in my judgment, a common origin, both being inherent in the sovereign authority—the object of both being the safety and welfare of the whole community—yet the weight of authority would seem to be that there exists a distinction between these two modes of taking individual property for public use. West River Bridge Co. v. Dix, 6 How. [47 U. S.] 507; Brewster v. Hough, 10 N. H. 138,—in which it was held "that the power of taxation is essentially a power of sovereignty, or eminent domain." But see Com. v. Alger, 7 Cush. 53, and Williams v. Mayor of Detroit, 2 Mich. 560. The direct question has not—at least so far as my knowledge extends—been decided by any of the national courts. See State of New Jersey v. Wilson, 7 Cranch. [11 U. S.] 164; Charles River Bridge v. Warren Bridge, 11 Pet. [36 U. S.] 420, 640, Story, J.; Gilman v. City of Sheboygan, 2 Black. [67 U. S.] 510. But whether there is any substantial difference in principle is not here a question requiring determination. It is enough for me on this occasion to declare that congress has not made any provision for trial, by jury, whether property be taken by right of eminent domain, or by authority of the taxing power.

It is, nevertheless, unquestionable that when the government appropriates individual property for public purposes, the obligation to make just compensation is concomitant;

but congress is the sole judge of how the compensation shall be ascertained and paid. And as to the executorial and summary modes employed for the collection of taxes—fixed debts due to the government—although they cause a certain diversity in "the law of the land," and although such proceedings have been sometimes questioned, as infringing the right of trial by jury; nevertheless, it is, at this day, too well settled in this country—and in England from time immemorial—to be now disputed. Moreover, the collection of the excise or public taxes has never been deemed a judicial, but simply a ministerial act. Murray v. Hoboken Land & Imp. Co., 18 How. [59 U. S.] 272; Peirce v. City of Boston, 3 Metc. (Mass.) 520.

Out of the provision in section 49 of the act of 1868, empowering a supervisor to examine premises, and to issue summons requiring persons to appear before him, testify under oath, produce their books, papers, &c. —and that part of section 9 of the act of July, 1866, which provides the mode of compelling obedience to the summons—two questions arise for adjudication. The one is based upon the fourth amendment of the constitution, which says "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." The other is found among the enumerated private rights in the fifth amendment, and is as follows: No one shall "be deprived of life, liberty, or property, without due process of law."

The rights of personal security, personal liberty, and private property—and incidentally, the near identity of writs of assistance and general warrants to the summons issued by the supervisor, were fully discussed.

The introduction into the constitution of the provisions in regard to search warrants, was doubtless occasioned by the strong feeling excited both in England and America, from the practice of issuing general warrants on bare suspicion and without foundation, empowering the officer to enter and search any house, to break open any receptacle, seize and carry away all or any private papers or other property. These abuses had continued for many years until, at length, in 1765, the court of king's bench (then presided over by Lord Camden), in the case of Entick v. Carrington, 2 Wils. 275, declared them to be manifestly illegal. Vide Huckle v. Money, Id. 205; Money v. Leach, 1 W. Bl. 555; Com. v. Dana, 2 Metc. [Mass.] 329; Story, Const. § 1901. Several years anterior to the decision in Entick v. Carrington, the illegality of general warrants had been eloquently maintained by James Otis, in Massachusetts, in the discussion had respecting writs of assistance. The writer of an able

article on Mr. Otis in the July number of the Am. Law Rev. (1869), gives a brief history of these writs, derived from notes to Quincy by Mr. Justice Gray, of the supreme judicial court of Massachusetts. A copy of this writ may be found in the article. It authorized the person to whom it was issued to enter, accompanied by a sheriff, justice of the peace, or constable, any house, where uncustomed goods were suspected to be concealed; and, if resistance was made, the writ empowered the searcher to break open the house and seize the goods. These writs, modified in some degree, are still of force in England. 3 Am. Law Rev. 641; 4 Bancr. Hist. U. S. 414.

Counsel for the Meadors contended that, if there was any distinction in principle between general search warrants or writs of assistance and the power claimed by the supervisor to enter and examine premises, and to issue summons requiring persons to appear before him, &c., there was no difference in their practical effect—each being repugnant to the constitution, and all equally illegal.

The first point in the question presented for decision, is as to the right of the supervisor to enter and examine the premises. This power, as already noticed, is given by section 49 of the act of 1868, and no warrant whatever is made necessary before entry and examination.

Sir William Blackstone, speaking of the excise duty, which is an inland imposition upon commodities, charged, in some cases, on the manufacturer, and in others, on the seller or dealer in the manufactured articles, and answering substantially to our system of internal revenue or taxes, says: "The frauds that might be committed in this branch of the revenue, unless a strict watch is kept, make it necessary, wherever it is established, to give the officers the power of entering and searching the houses of such as deal in excisable commodities at any hour of the day, and, in many cases, the night likewise." 1 Bl. Comm. 318. Such was the law of England and of the colonies prior to the war of independence, and so it has continued to this day under the national government, and in nearly every state of the Union; and the validity of this apparently rigorous law, in its application to the inland revenue and the collection of taxes, has never yet been successfully questioned. Vide Act March 3, 1791 (1 Stat. 139); Act May 8, 1792 (1 Stat. 267); Act July 22, 1813 (3 Stat. 22) &c.

The second point in the question for determination involves the right of the supervisor to issue summons requiring persons to come before him, to testify under oath, and to produce their books, &c., for his inspection. The legal principles which govern the first point in this question are so closely blended with those which control the second, that the answer given to the first might suffice for this.

The objection made to the power given to

the supervisor by the statutes is, as just mentioned, that it is forbidden by the fourth amendment to the constitution. But this is a civil proceeding, and in no wise does it partake of the character of a criminal prosecution; no offense is charged against the Meadors. Therefore, in this proceeding, the fourth amendment is not violated. Said Merrick, J., in pronouncing the judgment of the court in Robinson v. Richardson, 13 Gray, 454: "Search warrants were never recognized by the common law as processes which might be availed of by individuals in the course of civil proceedings, or for the maintenance of any mere private right; but their use was confined to cases of public prosecutions, instituted and pursued for the suppression of crime or the detection and punishment of criminals." Murray v. Hoboken Land & Imp. Co., supra; 1 Bish. Cr. Proc. § 716. I do not perceive any likeness in principle between the summons issued by the supervisor and either general warrants or writs of assistance.

The second question in this branch of the case grows out of that important private right secured to the citizen by the fifth amendment, that he shall not "be deprived of life, liberty, or property, without due process of law." This provision is deduced from its grand original, chapter 29 of the Great Charter, which protected every individual in the free enjoyment of his life, his liberty and his property, unless declared to be forfeited by the judgment of his peers, or the law of the land. By "law of the land" was probably meant the ancient Saxon common law.

In Murray v. Hoboken Land & Imp. Co., supra, it was said by Curtis, J., in delivering the judgment of the court: "The words 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land.'" If the converse of this be true, the phrase, "by the law of the land," imports a meaning as comprehensive as "due process of law," and consequently includes, like the latter, trial by jury. But neither—even in an enlarged sense—means that, to deprive a man of his life, his liberty, or his property by means of the law in its regular administration through courts of justice, the intervention of a jury is, in all cases, necessary. Take for instance the case of a person indicted for a capital or other offense, and who, on arraignment, instead of pleading "not guilty" to the charge elects, for reasons satisfactory to himself to plead "guilty;" if the indictment be sufficient in law the court awards judgment against him; and this is judgment "by the law of the land," and as lawful under the constitution as if he had been tried and found guilty by the judgment of his peers. So, if a person stands in contempt of the court, the court summarily punishes him by fine and imprisonment, or either, thus depriving him of his property, or liberty, or both, without a trial by jury. And it may be remarked that if the imprisonment

be for a time certain, executive pardon is the only mode of releasing him, before the expiration of his sentence. So, in cases of demurrer or special verdict, or where a person makes default, or confesses judgment; and so, too, in equity causes, where trial by jury is quite unusual, men are deprived of their property. Other instances could readily be given to show that the words "by the law of the land," "due process of law," do not necessarily import a jury trial as essential in every case to deprive a person of his life, liberty or property. Indubitable proof of this may be found in the case of Murray v. Hoboken Land & Imp. Co., supra.

That case arose out of the act of May 15, 1820 (3 Stat. 592). The main question was, whether the issuing, by the solicitor of the treasury, of what was denominated in the statute a warrant of distress, against a defaulting collector of revenue, was in conflict with the constitution. The court held the law to be valid, and not inconsistent with the constitution. The decision was placed mainly on the ground that the ancient common law of England recognized a summary remedy for the recovery of debts due to the government. See Martin v. Mott, 12 Wheat. [25 U. S.] 19; U. S. v. Ferreira, 13 How. [54 U. S.] 40.

It was further insisted that the power given to the supervisor is violative of that clause in the fifth amendment to the constitution which declares that no one shall be compelled in any criminal case to be a witness against himself. This clause, like that in the fourth amendment in reference to search warrants, is applicable to criminal cases only.

And here a thought suggests itself. As the Meadors, subsequently to the passage of this act of July 20, 1868, applied for and obtained from the government a license or permit to deal in manufactured tobacco, snuff and cigars, I am inclined to be of the opinion that they are, by this their own voluntary act, precluded from assailing the constitutionality of this law, or otherwise controverting it. For the granting of a license or permit—the yielding of a particular privilege—and its acceptance by the Meadors, was a contract, in which it was implied that the provisions of the statute which governed, or in any way affected their business, and all other statutes previously passed, which were in pari materia with those provisions, should be recognized and obeyed by them. When the Meadors sought and accepted the privilege, the law was before them. And can they now impugn its constitutionality or refuse to obey its provisions and stipulations, and so exempt themselves from the consequences of their own acts?

These internal revenue or tax laws were characterized as being not only repugnant to the constitution, but also unreasonably burdensome. With the most minute attention I examined those portions of the acts of July 13, 1866, and July 20, 1868, presented for my consideration; and carefully sought to ascer-

tain whether they were in conflict with any of the provisions of the constitution. My conclusion on that question has been expressed. I do not concur with counsel, that these laws are unreasonably burdensome. But even if they are, nay, even if they are oppressive, and unjust modes are employed for their enforcement, the remedy lies with congress, and not with the judiciary. By enacting these laws congress has exercised the constitutional power of taxation, and the courts have no power to interfere. Providence Bank v. Billings, 4 Pet. [29 U. S.] 514; Extension of Hancock Street, 18 Pa. St. 26; Kirby v. Shaw, 19 Pa. St. 258; Livingston v. Mayor, etc., of New York, 8 Wend. 85; In re Opening Furman Street, 17 Wend. 649; Herrick v. Randolph, 13 Vt. 525. In McCulloch v. State of Maryland, 4 Wheat. [17 U. S.] 316, 430, Chief Justice Marshall said, that it was unfit for the judicial department to "inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power."

Thus it will be seen that there are many cases in which the right of property must be made subservient to the public welfare. The maxim of the law is, that a private mischief is to be endured rather than a public inconvenience. On this ground rests the right of public necessity. 2 Kent, Comm. 336. And it is well to bear in mind that the national government is supreme within its constitutional limits, for to it is intrusted the paramount interest of the whole nation.

In declaring and carrying into effect the laws, my action, as a judge, will ever be "to use the least possible power adequate to the end proposed." Yet, let no one hesitate to do homage to the law; the very least as feeling her care. and the greatest as not exempted from her power.

Order.—It is ordered that the said John T. Meador, Newton J. Meador, and James G. Meador, composing the firm of Meador & Brothers. dealers in tobacco, in obedience to the summons of the supervisor, appear forthwith before him, and answer under oath, touching the receipt. storage, delivery or sale by the firm of Meador & Brothers, between July 20, 1868, and July 1, 1869, of any and all tobacco which came to their possession, or under their control in the way of business, during said period. And, also, that they, at the same time, produce to the said supervisor all books and papers of said firm, specified in said summons, which contain any entry, statement, or communication touching or in any way relating to tobacco.

And it is further ordered, that the clerk file this opinion in his office, and, that on payment of his fee, he furnish to the supervisor a copy of the same certified under his official seal.

NOTE. An application was made. a few days after the above determination. by the defendants' counsel, for a writ of error. and a super-

sedeas. Objection was made in behalf of the government, that no provision of law existed whereby a writ of error would lie to a decision made by the judge in a proceeding of this nature out of court, and whilst he was sitting simply as judge under the revenue acts of 1866 and 1868. The objection was sustained, and the application denied.